IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

JOSE FIGUERAS,

                    Plaintiff,          Civil Action No.
                                        9:15-CV-0909 (GLS/DEP)

        v.

D. VENETTOZZI and CAPTAIN
WILKINS,

                    Defendants.

─────────────────────────────

<u>APPEARANCES</u>:                     <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

JOSE FIGUERAS, *Pro Se*
89-B-2337
Fishkill Correctional Facility
P.O. Box 1245
Beacon, New York 12508

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN        JOHN F. MOORE, ESQ.
New York State Attorney General  Assistant Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

This is a civil rights action brought by *pro se* plaintiff Jose Figueras, a New York State prison inmate, against two individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that during the course of a disciplinary hearing and the ensuing appeal process, his procedural due process rights were violated by defendants.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint. Plaintiff has not opposed defendants' motion. For the reasons set forth below, I recommend that the motion be granted.

I.    BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. Although he is now housed elsewhere, at the times relevant to the events giving rise to this action, plaintiff was confined in Eastern Correctional Facility ("Eastern"), located in Napanoch, New York. *Id.* at 1-2; Dkt. No. 25-2 at 71.

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

This action arises out a misbehavior report issued to plaintiff on May 13, 2013, by Corrections Officer N. Damian, who is not a named defendant. Dkt. No. 1 at 2-3; *see also* Dkt. No. 25-2 at 73, 81. In that misbehavior report, Damian accused plaintiff of violating several prison rules, charging him with interference, stalking, harassment, and refusing a direct order. Dkt. No. 25-2 at 13, 106. In its entirety, the misbehavior report reads as follows:

> Inmate Figueras has initiated several interactions with me that are inappropriate and personal. On Thursday May 9, 2013 [sic] while sitting at a table writing, I felt someone grab my left foot and said 'boo'. [sic] I immediatly [sic] turned to my left and saw inmate Figueras bent down next to me. I told him that his actions were not appropriate. On several occassions [sic] while walking in the North Hall parking lot, I heard an inmate yell out the window to me, which I ignored. Last week inmate Figueras told me that he was trying to get my attention by yelling to me in the parking lot. He questioned me on what type of music I was listening to in my car. On May 11, 2013, while I was speaking with another inmate he repeatedly interrupted and attempted to persuade my decision in favor of the inmate. I gave him several direct orders to stop interfering but he continued to interupt [sic] me. He raised his voice gaining the attention of the other inmates in the area. I then told him to leave the area and he complied.

*Id.*

A Tier III disciplinary hearing[2] was conducted by defendant Captain Wilkins in connection with the misbehavior report beginning on May 15, 2013, and concluding on May 28, 2013.[3] Dkt. No. 25-2 at 21, 44, 110. At the hearing several witnesses testified, including Damian. *Id.* at 21-44. To the extent relevant to plaintiff's claims in this action, Damian testified that she heard "somebody like say shu shu out the North Hall window" on an unspecified date, but definitely "sometime before the 9th [of May]." *Id.* at 28. Damian further stated that she did not know who called out the window to her, and she ignored the comment at the time. *Id.* No one else testified at the disciplinary hearing regarding this aspect of the misbehavior report. Plaintiff objected to the stalking charge on the ground that the misbehavior report did not specify a date or time associated with the allegation that he called to Damian out a window. *Id.* at 23. According to plaintiff, as a result

---

[2]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

[3]    The disciplinary hearing was conducted over the course of several, non-consecutive days to accommodate the availability of certain witnesses. *See generally* Dkt. No. 25-2 at 21-44.

of that omission, he was unable to mount a meaningful defense to the charge. *Id.*; *see also* Dkt. No. 1 at 7.

With respect to the charge in the misbehavior report accusing plaintiff of disobeying a direct order, Damian testified at the disciplinary hearing that plaintiff would not listen to her on May 11, 2013, and that he did not remain silent when she directed him to do so. Dkt. No. 25-2 at 29. Several other witnesses, all called on behalf of the plaintiff, testified that plaintiff and Damian were not arguing on May 11, 2013, and that Damian never ordered plaintiff to stop interfering. *Id.* at 35, 37-38, 40. One of plaintiff's witnesses, however, acknowledged that Damian instructed plaintiff to leave the area and mind his own business. *Id.* at 34.

At the conclusion of the disciplinary hearing, plaintiff was exonerated in connection with the harassment charge but found guilty of disobeying a direct order, interference, and stalking. Dkt. No. 25-2 at 44, 47. In his written statement explaining the evidence upon which he relied in rendering his determination, defendant Wilkins stated the following:

> The written misbehavior report & verbal testimony of
> CO Damien [sic]. One of the witnesses stated that
> CO Damien [sic] did tell you to not get involved with
> her verbal counseling another [inmate] & you
> disregarded that order & continued to intervine [sic]
> on the other [inmate's] behalf. CO Damien [sic]
> testimony indicates that you were attempting to get

> familiar with her on a personal level which is
> inappropriate.

*Id.* at 49. As a penalty, defendant Wilkins imposed 107 days of disciplinary

confinement in the facility's special housing unit ("SHU") coupled with the

loss of certain privileges for a period of ninety days. *Id.*

Plaintiff appealed defendant Wilkins' determination to defendant D.

Venettozzi, the Acting Director of the DOCCS Special Housing/Inmate

Disciplinary Program. *Id.* at 51-57. With respect to defendant Wilkins'

determinations related to the interference and refusing-a-direct-order

charges, plaintiff argued on appeal that that none of the witnesses testified

during the disciplinary hearing that Damian directed him to not get

involved with her verbal counseling of another inmate. *Id.* at 52, 126. With

respect to the stalking determination, plaintiff argued that 7 N.Y.C.R.R. §

251-3.1 was violated because the date, time, and place of the incident was

not specifically delineated in the misbehavior report.[4] *Id.* at 55. On July 24,

2013, defendant Venetozzi affirmed the determination rendered by

defendant Wilkins. *Id.* at 59.

As a result of defendant Wilkins' determination, plaintiff served

eighty-four days of SHU confinement instead of the 107 days to which he

---

[4] In relevant part, section 251-3.1 mandates that a "misbehavior report shall include . . . the date, time, and place of the incident[.]" 7 N.Y.C.R.R. § 251-3.1(c)(3).

was sentenced. Dkt. No. 25-2 at 112-13. The remaining twenty-three days of his sentence were converted to keeplock confinement following his transfer into another prison facility. *Id.* at 113.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action in the Southern District of New York on or about July 13, 2015, with the filing of a complaint and accompanying application to proceed in the case *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. District Judge Loretta A. Preska thereafter directed that the action be transferred to this district by order dated July 21, 2015. Dkt. No. 4. Although plaintiff's initial IFP application was denied as incomplete, *see* Dkt. No. 6, he filed a second motion for leave to proceed without prepayment of fees, which was subsequently granted in a decision issued by Senior District Judge Gary L. Sharpe. Dkt. Nos. 9, 13. In his decision, Judge Sharpe also reviewed plaintiff's complaint pursuant to 28 U.S.C. §§ 1915(e), 1915A and dismissed all claims asserted against defendants Wilkins and Venettozzi in their official capacities, but otherwise accepted plaintiff's complaint for filing. Dkt. No. 13.

Following the close of discovery, defendants filed the currently pending summary judgment motion seeking dismissal of the remaining due process causes of action asserted against them. Dkt. No. 25-5. In

their motion, defendants argue that no reasonable factfinder could conclude that plaintiff's due process rights were violated in connection with the disciplinary hearing conducted by defendant Wilkins. *See generally id.* In the alternative, defendants contend that they are entitled to qualified immunity from suit. *Id.* Although plaintiff was afforded an opportunity to respond to defendants' motion, and was granted an extension of time to do so, he has failed to file any opposition with the court. Dkt. Nos. 27, 28. Defendants' motion is now fully briefed and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Plaintiff's Failure to Oppose Defendants' Motion

Before turning to the merits of defendants' motion, I must first address the threshold issue of the legal significance of plaintiff's failure to oppose defendants' motion.

Pursuant to local rule 7.1(b)(3), by failing to oppose defendants' motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) (holding that district courts may enter summary judgment in favor of a moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendants' motion. The motion was properly filed by defendants Wilkins and Venettozzi, and defendants, through their motion, have met their burden of demonstrating *prima facie* entitlement to the relief requested. With respect to the question of whether defendants have met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, their motion need only be 'facially meritorious.'" *See Rodriguez v. Goord*, No. 04-CV-0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant

has satisfied its burden to demonstrate entitlement to a dismissal under rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[5]

Because defendants have accurately cited both proper legal authority and evidence in the record supporting the facts which, they contend, are undisputed grounds on which their motion is based, and plaintiff has failed to respond in opposition to the summary judgment motion, I find that defendants' motion is facially meritorious. *Jackson*, 766 F.3d at 194. Accordingly, I recommend that the court grant defendants' motion on this basis.

It should also be noted that there are additional consequences as a result of plaintiff's failure to oppose defendants' motion, and in particular his failure to respond to defendants' local rule 7.1(a)(3) statement of material facts. Local rule 7.1 provides, in relevant part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-

---

[5]     All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendants' local rule 7.1 statement, *see* Dkt. No. 25 at 3, Dkt. No. 26 at 2, and nonetheless has failed to do so, I recommend that the court deem the facts contained in defendants' local rule 7.1(a)(3) statement as having been admitted to the extent they are supported by

accurate record citations.[6] *See*, *e.g.*, *Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996).

## B. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be

---

[6]     As to any facts not contained in defendants' local rule 7.1(a)(3) statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d at 137.

decided with respect to any essential element of the claim in issue; when this burden is not met, the motion must be denied. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C.    Plaintiff's Due Process Claims[7]

Plaintiff alleges that defendant Wilkins violated his due process rights by (1) relying on a witness' testimony that plaintiff refused Damian's direct order on May 11, 2013, in determining that plaintiff was guilty of the violation charged; and (2) finding him guilty on the stalking charge despite the fact the misbehavior report did not include a date and time for the alleged incident forming a basis for the accusation. *See, e.g.,* Dkt. No. 2 at 6-7. Plaintiff accuses defendant Venettozzi of violating his due process rights by affirming defendant Wilkins' disposition at the disciplinary hearing. *Id.* at 7.

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of

---

[7]    Although I have recommended dismissal of plaintiff's complaint based on his failure to respond to defendants' motion, out of an abundance of caution, I have also reviewed the merits of defendants' motion.

a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, to determine whether a plaintiff may prevail on his due process claim, courts inquire whether the allegations related to the conditions of a plaintiff's disciplinary confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the

segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)).

In cases involving relatively short periods of segregated confinement, where the plaintiff has not alleged that he was subjected to any unusual conditions beyond those typical of an SHU setting, a court may not need to undergo a detailed analysis of the conditions of confinement. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658. For cases like this one that involve periods of disciplinary confinement falling between 101 and 305 days, in order to determine whether a plaintiff has suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required to go further and "articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 F. App'x 120, 123 (2d Cir. 2008).

During his deposition in this matter, plaintiff described both the conditions of confinement for DOCCS inmates in general population, as well as the conditions of his confinement while in the SHU and keeplock. Plaintiff testified that while in general population, he participated in two vocations, one in the morning, and one in the afternoon. Dkt. No. 25- 2 at

74. He exercised once per day, communicated with his wife for one-half hour daily, and occasionally watched television. *Id.* at 75-76. In addition, while there is no air conditioning in general population, inmates are permitted to possess individual fans. *Id.* at 121. Plaintiff did not testify regarding the duration of his daily recreation or how often he was permitted to shower while in general population.

Turning to the conditions of confinement he experienced while housed in the SHU, plaintiff testified that he was confined in a sealed room with little air circulation, no air conditioning, and no fans during the summer months of May, June, July, and August. Dkt. No. 25-2 at 117-18, 121. Because of the heat, plaintiff suffered two nosebleeds. *Id.* 118. Although he requested medical attention for one of his nosebleeds, he was told to use a tissue and "deal with it." *Id.* at 120. Using just a tissue, plaintiff was able to keep his nose clean and otherwise managed to address the nosebleed. *Id.* On two other occasions, plaintiff requested and received medical attention, including when he requested allergy and acid-reflux medication and was sick with food poisoning. *Id.* at 119-20. Indeed, plaintiff testified that a nurse at the prison walked around the SHU three times each day to provide inmates with medical care. *Id.* at 119.

Plaintiff's sentence in the SHU commenced on or about May 12, 2013. Dkt. No. 25-2 at 47. At that time, plaintiff was confined to his cell for twenty-three hours per day, allowed one hour of recreation per day, permitted to shower every-other-day, and received visitors once per week on a weekend day. *Id.* at 115. In approximately mid-June 2013, however, plaintiff was made a SHU porter. *Id.* at 116, 117. As a porter, he was tasked with sweeping, mopping, emptying the SHU garbage, taking care of the laundry, and handling inmates' property when necessary. *Id.* at 116. In exchange for his work as a porter, plaintiff received special privileges not otherwise available to inmates locked in the SHU, including access to a daily shower, extra recreation time, and extra food. *Id.* at 116-17. On two occasions during his SHU confinement, plaintiff's toilet became clogged but was fixed within two days of reporting the problem. *Id.* at 118.

Although defendant Wilkins sanctioned plaintiff to a total of 107 days of SHU confinement – consisting of seventeen days of pre-hearing confinement and ninety days post-hearing – he spent the last three weeks in keeplock confinement following his transfer to Comstock Correctional Facility ("Comstock"). Dkt. No. 25-2 at 47, 143. Plaintiff testified at his deposition in this matter that, while confined in keeplock at Comstock, he did not experience any nosebleeds or problems with the temperature, his

toilets worked, and otherwise did not experience any unusual circumstances. *Id.* at 143-44.

In light of plaintiff's comparison of the conditions existing in general population and those experienced while confined in the SHU and in keeplock over the relevant 107-day period, no reasonable factfinder could conclude that plaintiff suffered an atypical or significant hardship by his disciplinary confinement. For much of his time confined in the SHU, plaintiff was afforded special privileges, including daily showers and additional recreation time, as a result of his job as a porter. For the entire period of SHU confinement, plaintiff received adequate medical attention when he requested it; his SHU cell had a window that opened and provided some air circulation; and, although the SHU cells are not air conditioned, neither are those in general population. According to plaintiff's own testimony, he did not experience any unusual circumstances during his keeplock confinement at Comstock. All of these conditions, as described by plaintiff, did not "present a dramatic departure from the basic conditions of [plaintiff's] . . . sentence." *Sandin*, 515 U.S. at 485.

Because atypicality is a matter of law for the court to decide when the facts are not in dispute, which is the case in this instance, *Sealey*, 197 F.3d at 585, I recommend that plaintiff's due process claim be dismissed

on this ground. *See, e.g., Husbands v. McClellan*, 990 F. Supp. 214, 217-19 (W.D.N.Y. 1998) (granting summary judgment to the defendant where plaintiff had presented evidence that he was confined for 180 days in the SHU under several conditions that were more restrictive than those imposed in general population); *see also Taylor*, 238 F.3d at 194 (finding that a plaintiff's due process claims "cannot succeed . . . if he fails to establish a protected liberty interest").

IV.   SUMMARY AND RECOMMENDATION

Based upon the record now before the court, I find as a matter of law that plaintiff was not deprived of a liberty interest when he served eighty-four days in SHU confinement and an additional twenty-three days of keeplock, during which times he was not made to suffer atypical or significant hardships as compared to those inmates in general population. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this

report.[8] FAILURE TO SO O BJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     January 20, 2017
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

---

[8]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jose RODRIGUEZ, Plaintiff,
v.
Glen S. GOORD, et al, Defendants.
No. 9:04-CV-0358 (FJS/GHL).

Nov. 27, 2007.
Jose Rodriguez, Willard, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, David L. Cochran, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

FREDERICK J. SCULLIN, Senior District Judge.

**\*1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed November 6, 2007, and the Court having reviewed the Report-Recommendation and the entire file in this matter, and no objections to said Report-Recommendation having been filed, the Court hereby

**ORDERS,** that Magistrate Judge Lowe's November 6, 2007 Report-Recommendation is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS,** that Defendants' motion, pursuant to Local Rule 41.2(b), to dismiss for Plaintiff's failure to provide notice to the Court of a change of address, is **GRANTED;** and the Court further

**ORDERS,** that the Clerk of the Court enter judgment in favor of the Defendants and close this case.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, Jose Rodriguez ("Plaintiff") alleges that, while he was an inmate at Oneida Correctional Facility in 2003 and 2004, ten employees of the New York State Department of Correctional Services ("Defendants") were deliberately indifferent to his serious medical needs, and subjected him to cruel and unusual prison conditions, in violation of the Eighth Amendment. (Dkt. No. 27 [Plf .'s Am. Compl.].) Currently pending is Defendants' motion to dismiss for failure to provide notice to the Court of a change of address, pursuant to Local Rule 41.2(b) of the Local Rules of Practice for this Court. (Dkt. No. 86.) Plaintiff has not opposed the motion, despite having been given more than six weeks in which to do so. Under the circumstances, I recommend that (1) Defendants' motion to dismiss be granted, and (2) in the alternative, the Court exercise its inherent authority to *sua sponte* dismiss Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

### I. DEFENDANTS' MOTION TO DISMISS

Under the Local Rules of Practice for this Court, Plaintiff has effectively "consented" to the granting of Defendants' motion to dismiss, since (1) he failed to oppose the motion, (2) the motion was properly filed, and (3) Defendants have, through the motion, met their burden of demonstrating entitlement to the relief requested in the motion. L.R. 7.1(b)(3).

In particular, with regard to this last factor (i.e., that Defendants have met their burden of demonstrating entitlement to the relief requested), Defendants argue that their motion to dismiss should be granted because (1) Local Rule 41.2(b) provides that "[f]ailure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

action," (2) on April 15, 2004, Plaintiff was specifically advised of this rule when (through Dkt. No. 5, at 4) the Court advised Plaintiff that "his failure to [promptly notify the Clerk's Office and all parties or their counsel of any change in his address] will result in the dismissal of his action," (3) on May 22, 2007, Plaintiff was released from the Willard Drug Treatment Center, (4) since that time, Plaintiff has failed to provide notice to the Court (or Defendants) of his new address, as required by Local Rule 10.1(b)(2), and (5) as a result of this failure, Defendants have been prejudiced in that they have been unable to contact Plaintiff in connection with this litigation (e.g., in order to depose him, as authorized by the Court on May 4, 2007). (Dkt. No. 86, Part 4, at 1-2 [Defs.' Mem. of Law].)

**\*2** Authority exists suggesting that an inquiry into the third factor (i.e., whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] ) is a more limited endeavor than a review of a contested motion to dismiss.[FN1] Specifically, under such an analysis, the movant's burden of persuasion is lightened such that, in order to succeed, his motion need only be "facially meritorious." [FN2] Given that Defendants accurately cite the law and facts in their memorandum of law, I find that they have met their lightened burden on their unopposed motion. Moreover, I am confident that I would reach the same conclusion even if their motion were contested.

FN1. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at \*7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before an unopposed motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" [emphasis added; citations omitted]; *Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-10 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *see also Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at \*2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1

[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at \*2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at \*3 (N.D.N.Y. Aug. 27, 1996) (Hurd, J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN2. *See, e.g., Hernandez,* 2003 U.S. Dist. LEXIS 1625 at \*8.

For these reasons, I recommend that the Court grant Defendants' motion to dismiss.

## II. *SUA SPONTE* DISMISSAL

Even if Defendants have not met their burden on their motion to dismiss, the Court possesses the inherent authority to dismiss Plaintiff's Amended Complaint *sua sponte* under the circumstances. Rule 41 of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a proceeding for (1) failure to prosecute the action and/or (2) failure to comply with the Federal Rules of Civil Procedure or an Order of the Court. Fed.R.Civ.P. 41(b).[FN3] However, it has long been recognized that, despite Rule 41 (which speaks only of a *motion* to dismiss on the referenced grounds, and not a *sua sponte* order of dismissal on those grounds), courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972). Indeed, Local Rule 41.2(a) not only recognizes this authority but *requires* that it be exercised in appropriate circumstances. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

FN3. Fed.R.Civ.P. 41(b) (providing, in pertinent part, that "[f]or failure of the plaintiff to prosecute or to comply with these rules or any

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

order of court, a defendant may move for dismissal of an action or of any claim against the defendant").

**A. Failure to Prosecute**

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN4] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute:

FN4. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN5]

FN5. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41[b] dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) [citation and internal quotation marks omitted].

**\*3** As a general rule, no single one of these five factors is dispositive.[FN6] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN7]

FN6. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

FN7. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal. The duration of Plaintiff's failure is some six-and-a-half months, i.e., since April 22, 2007, the date of the last document that Plaintiff attempted to file with the Court (Dkt. No. 85). Plaintiff received adequate notice (e.g., through the Court's above-referenced Order of April 15, 2004, and Defendants' motion to dismiss) that his failure to litigate this action (e.g., through providing a current address) would result in dismissal. Defendants are likely to be prejudiced by further delays in this proceeding, since they have been waiting to take Plaintiff's deposition since May 4, 2007. (Dkt. No. 84.) I find that the need to alleviate congestion on the Court's docket outweighs Plaintiff's right to receive a further chance to be heard in this action.[FN8] Finally, I have considered all less-drastic sanctions and rejected them, largely because they would be futile under the circumstances (e.g., an Order warning or chastising Plaintiff may very well not reach him, due to his failure to provide a current address).

FN8. It is cases like this one that delay the resolution of other cases, and that contribute to the Second Circuit's dubious distinction as having (among the twelve circuits, including the D.C. Circuit) the longest median time to disposition for prisoner civil rights cases, between 2000 and 2005 (9.8 months, as compared to a national average of 5.7 months). Simply stated, I am unable to afford Plaintiff with further special solicitude without impermissibly burdening the Court and unfairly tipping the scales of justice against Defendant.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)

(Cite as: 2007 WL 4246443 (N.D.N.Y.))

**B. Failure to Comply with Order of Court**

With regard to the second ground for dismissal (a failure to comply with an Order of the Court), the legal standard governing such a dismissal is very similar to the legal standard governing a dismissal for failure to prosecute. "Dismissal ... for failure to comply with an order of the court is a matter committed to the discretion of the district court." [FN9] The correctness of a dismissal for failure to comply with an order of the court is determined in light of five factors:

> FN9. *Alvarez v. Simmons Market Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988) [citations omitted].

(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.[FN10]

> FN10. *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) [citations omitted].

Here, I find that, under the circumstances, the above-described factors weigh in favor of dismissal for the same reasons as described above in Part II.A. of this Report-Recommendation. I note that the Order that Plaintiff has violated is the Court's Order of April 15, 2004, wherein the Court ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 5, at 4.) Specifically, the Court advised plaintiff that ***"[p]laintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do same will result in the dismissal of this action."*** (*Id.*) I note also that, on numerous previous occasions in this action, Plaintiff violated this Order, resulting in delays in the action. (*See* Dkt. Nos. 47, 48, 49, 50, 54, 59, 72, 78, 79 & Dkt. Entry for 12/15/06 [indicating that mail from the Court to Plaintiff was returned as undeliverable.])

**\*4** As a result, I recommend that, should the Court decide to deny Defendants' motion to dismiss, the Court exercise its authority to dismiss Plaintiff's Amended Complaint *sua sponte* for failure to prosecute and/or failure to comply with an Order of the Court.

**ACCORDINGLY,** for the reasons stated above, it is

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 86) be ***GRANTED%;*** and it is further

**RECOMMENDED** that, in the alternative, the Court exercise its inherent authority to ***SUA SPONTE DISMISS*** Plaintiff's Amended Complaint for failure to prosecute and/or failure to comply with an Order of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)..

N.D.N.Y.,2007.

Rodriguez v. Goord
Not Reported in F.Supp.2d, 2007 WL 4246443 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See, e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v., Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. [FN2] The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.](#) Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

*4 Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *AccordDavis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *SeeMurray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.), af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection to
a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp., 587 F.Supp.2d 579, 583 (S.D.N.Y.2008).* However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir.2003)*). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski, 2008 WL 420011, at \*2 (N.D.N.Y.2008)* (citing *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996)*). [FN1]

> FN1. Local Rule 7.1(a)(3) provides:
>
> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*
>
> The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*
>
> Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

**II. *Jeffreys* Exception**

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

*4 In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt".[FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

\* \* \*

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

**\*1** Presently before the Court are Plaintiff's motions for relief from judgment and for recusal of the undersigned. For the reasons set forth below, Plaintiff's motions are denied.

### I. BACKGROUND

Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), commenced the present 42 U.S.C. § 1983 action alleging violations of his Constitutional Rights on August 5, 1994. On July 18, 1993, while Plaintiff was incarcerated at Riverview Correctional Facility, defendant Baker alleges that she witnessed Plaintiff exposing himself to her in the recreation yard. Plaintiff was then taken from the yard to the infirmary by defendants Baker, Smith, and Hamilton. In his Amended Complaint, Defendant alleges, in relevant part, that he was repeatedly assaulted by defendants Davis, Smith, Mushen, and Hamilton while defendants Liscum, Baker, and Emery stood by and watched in violation of his Eighth Amendment rights. Plaintiff then alleges that he was escorted to the prison's special housing unit ("S.H.U.") and received further physical mistreatment from defendants Emery, Mushen, Hamilton, Smith, Farns, and Lincoln.

Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the disciplinary proceeding resulting from the incident, which was conducted by defendant Brunet. Finally, Plaintiff alleges that defendant Barkley participated in the violation of these rights by failing to address Plaintiff's grievances and by designating a biased hearing officer, defendant Brunet, to preside over Plaintiff's Tier III hearing.

On June 14, 1999, defendants Brunet, Baker and Barkley ("Defendants") filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an affirmation in opposition to Defendants' motion on June 23, 1999 and a letter response on July 6, 1999. By an Order dated October 25, 1999, this Court granted Defendants' motion for summary judgment and dismissed Plaintiff's case against them in its entirety. FN1 Plaintiff's current motions for relief from judgment and recusal were filed on November 12, 1999 and March 23, 1999, respectively.

> FN1. Also still pending before the Court is a motion for summary judgment filed by Plaintiff September 1, 1998. The motion was originally dismissed by the Court's Order adopting the Report–Recommendation of United States Magistrate Judge David R. Homer, which held that the motion was untimely and, in the alternative, that it failed on the merits. Then, by an Order dated June 1, 1999, the Court vacated its previous order and held that Plaintiff's motion would be addressed on the merits, along with Defendants' motion for summary judgment. However, Judge Homer's Report–Recommendation did address the merits of Plaintiff's motion. The Court has undertaken a de novo review of the record and has determined that Plaintiff's motion should be dismissed for the reasons discussed in the Report–Recommendation.

### II. ANALYSIS

A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

1. *Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

2. *Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995); Wright v. Smith, 21 F.3d 496, 501 (1994).* Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989).* Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright, 21 F.3d at 501.*

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe, No. 95 Civ. 10342, 1998 WL 391143, at \*5– \*6 (S.D.N.Y. July 13, 1998) (citing Beaman v. Coombe, No. 96 Civ. 3622, 1997 WL 538833, at \*3 (S.D.N.Y. Aug. 29, 1997), aff'd in relevant part No. 97–2683, 1998 WL 382751, at \*\*1 (2d Cir. May 13, 1998)).* Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner, 515 U.S. 472 (1995),* because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell, 418 U.S. 539 (1974);* and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir.1998)* (citing *Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).*

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey, 512 U.S. 477 (1994),* and *Edwards v. Balisok, 520 U.S. 641 (1997).* Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert, 179 F.3d 19, 27*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement. Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin.* However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible." ' *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

*9 ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.